## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL JOHN SHELIGA, | ) | Case No. 3:23-cv-00139 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| WINDBER BOROUGH, BRIAN MILLER, | ) | |
| *Windber Borough Police Officer,* and | ) | |
| DANIEL SCHRADER, *Former Windber* | ) | |
| *Borough Police Officer,* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

## I.   Introduction

Pending before the Court is Plaintiff Michael Sheliga's ("Sheliga") "Motion for a Temporary Restraining Order and Preliminary Injunction[.]" (ECF No. 15). Sheliga seeks "temporary restraining orders against [D]efendants Miller and Windber Borough" because two officers "threatened to arrest [him] for door to door canvassing[.]" (ECF No. 15-1 at 1). According to Sheliga, the relief he seeks is necessary to allow him "to engage in political speech with potential voters, including speech about the upcoming Windber Borough Municipal Elections while door to door canvassing." (ECF No. 15 at 1). For the following reasons, Sheliga's motion is **DENIED**.

## II.   Jurisdiction and Venue

The Court has jurisdiction over the action because all of Sheliga's claims sound in 42 U.S.C. § 1983 and therefore arise under federal law. 28 U.S.C. §§ 1331, 1338. Venue is proper

because a substantial portion of the events giving rise to this action occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

## III.   Factual Background

### A.   Video Footage of Sheliga's Relevant Interactions with the Windber Borough Police Department

As Sheliga himself states, "this case is mainly about the recorded videos of Defendants on 12.16.22 and 12.19.22." (ECF No. 25 at 3). On two occasions, while Sheliga was "engaging in political speech" by going door to door, he was stopped by an officer of the Windber Borough Police Department.[1] (ECF No. 1 at 4). These interactions were captured both by Sheliga recording them on his mobile phone and the officers' body-cameras. Videos from both perspectives were admitted into evidence, played at the preliminary injunction hearing, and relied upon by both parties. Accordingly, the Court draws its factual background primarily from those videos.

Sheliga's first relevant encounter with Windber Borough Police occurred on December 16, 2022. (*Id.*). The body-camera footage shows Corporal Miller approaching a woman on a residential street in his patrol vehicle. (ECF No. 11-2). The woman points down the street and states: "He is right there." (*Id.*). The woman explains that "he started in Conjelko's[2] [and] went

---

[1] The Court notes that Sheliga, in his Complaint, raises four "issues"—which the Court interprets as counts. (ECF No. 1 at 5). Sheliga labels the four issues as follows: (1) "Windber Soliciting Ordinance[,]" (2) "Threat of Arrest for Door to Door Canvassing[,]" (3) "Threat of Charges for Speaking to Officer Miller[,]" and (4) "Citation for Criticizing Officer Schrader[.]" (*Id.*). Only the first two issues are relevant to Sheliga's request for a temporary restraining order or preliminary injunction in order to canvass door to door without threat of arrest. This is because those two "issues" represent the two instances Sheliga relies upon in arguing Defendants are preventing him from going door-to-door. The last two issues have no bearing on Sheliga's allegations that Defendants are interfering with his right to canvass. Accordingly, the Court will only outline the facts relevant to the first two issues.

[2] Conjelko's is a "Dairy Store" located in Windber, Pennsylvania. *See* Conjelko's Dairy Store, https://conjelkos-store.edan.io/.

across the street." (*Id.*). She alleges the man "is knocking on every single door screaming at everybody. He's looking for the city council, and he's not going to stop until he finds the city council." (*Id.*).

The footage then shows Corporal Miller approaching Sheliga on the sidewalk. (*Id.*). Corporal Miller tells Sheliga that he "can't be knocking on doors." (*Id.*). Sheliga responds: "You said I can't be knocking on doors?" (*Id.*) "No, you cannot," Corporal Miller replies. (*Id.*) Corporal Miller then asks Sheliga what he is looking for, adding "these people don't know you, you're scaring them. You're scaring the neighborhood and that's why I was called." (*Id.*). After Sheliga says he is sorry to hear Corporal Miller "make that claim," Corporal Miller states: "It's not a claim. I am telling you you cannot do that." (*Id.*).

Sheliga then asks Corporal Miller if he is acting pursuant to "a particular law or statute." (*Id.*). Corporal Miller explains: "It's not a law, but you're disturbing others. That's a disorderly conduct." (*Id.*). After Sheliga suggests Corporal Miller said he would cite or arrest him, Corporal Miller clarified that he did not say he would cite Sheliga. (*Id.*). Sheliga goes on to ask Corporal Miller what would happen if he committed disorderly conduct, and Corporal Miller replied that he would be arrested. (*Id.*).

At that point, Sheliga notes that Corporal Miller is "responsible for reading and complying by [] federal laws," and suggests Corporal Miller read a United States Supreme Court Case—*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*. (*Id.*).

Corporal Miller then asks Sheliga what he was doing in Conjelko's, since "that's a place of business." (*Id.*). Sheliga replies by positing another Supreme Court case to support the proposition that Corporal Miller "cannot discriminate based upon the content of my speech."

(*Id.*). Corporal Miller replies that Sheliga cannot be "disorderly inside that place of business, hindering their business." (*Id.*). When Sheliga assures Corporal Miller that was not the case, Corporal Miller states: "Well, that's what I got called here for." (*Id.*).

Corporal Miller goes on to explain that he "got [a call] from another person that didn't know who you were [who] stated you were looking for council." (*Id.*). Sheliga responds that he is under no requirement to answer. (*Id.*). After Corporal Miller asks Sheliga about his place of residence, Sheliga states that he is done answering questions. (*Id.*).

Corporal Miller then tells Sheliga "not to be pounding on doors and disturbing these people." (*Id.*). After Sheliga again tells him to read *Watchtower*, Corporal Miller states: "I'm not going to read that. I'm telling you the issue here." (*Id.*). Sheliga then alleges to Corporal Miller that he is "violating [his] First Amendment rights[,]" which Corporal Miller denies. (*Id.*). The interaction concludes with Corporal Miller and Sheliga going their separate ways. (*Id.*).

Sheliga's second encounter with the Windber Borough Police Department occurred three days later on December 19, 2022. (ECF No. 11-3). This time another officer, Corporal Balderas, approaches Sheliga on the sidewalk. (*Id.*). Corporal Balderas states that "somebody called and said that you were going around knocking door to door[,]" and asks what is going on. (*Id.*). When Corporal Balderas asks why Sheliga is going door to door, Sheliga states that he "simply wish[es] to engage in speech." (*Id.*). Sheliga explains that he is "talking to people in your fine town about the police department and the town council." (*Id.*).

At that point, Corporal Balderas states: "That's fine. Do you have a solicitation permit to do so?" (*Id.*). When Sheliga claims he does not need a permit, Corporal Balderas explains that "in the Borough of Windber you do. It is a requirement, and that can be easily attained at our police

station by our Police Chief who is not in today." (*Id.*). Corporal Balderas goes on to say: "I do ask

that you stop, only because I got a couple complaints saying that they didn't want you going door

to door. One lady in particular wasn't too happy of the fact that you went to her door." (*Id.*).

Corporal Balderas then explains that the callers were concerned because students would be let

out of school soon and would be walking home. (*Id.*).

In response, Sheliga again asserts his belief that the Supreme Court case he mentioned to

Corporal Miller, *Watchtower*, permitted his activities. (*Id.*). Corporal Balderas explains that he

"understand[s] everything [Sheliga is] explaining," but "we do have that requirement in this

Borough." (*Id.*). He goes on to state: "It is a requirement. It is unlawful for you to do that. I am

asking that you stop, because if I continue to get any more complaints, obviously I would have

to [] take action[.]" (*Id.*).

After Sheliga asks if he is free to leave, Corporal Balderas explains that he is. (*Id.*). In

parting, Corporal Balderas tells Sheliga: "I'm just giving you a fair warning. Just make sure—

these people don't want you going door to door. I got a couple complaints already. If it continues

on, like I said, and somebody wants to file a disorderly conduct unfortunately we'll have to take

that route." (*Id.*).

### B.  Testimony from the Preliminary Injunction Hearing[3]

#### 1.  Relevant Testimony from Sheliga

---

[3] The Court notes that, due to the highly time-sensitive nature of Sheliga's request for relief, the Court was unable to obtain a transcript of the preliminary injunction hearing before issuing this opinion. However, the Court took diligent notes throughout the hearing and accordingly recounts the testimony offered at the hearing on that basis. The Court also notes that it is not taking the facts contained in this subsection as true. Instead, the Court makes its findings of fact in conjunction with its analysis of the sufficiency of Sheliga's request for relief below.

At the preliminary injunction hearing, Sheliga's testimony largely revolved around the videos presented of his interactions with Corporal Miller and Corporal Balderas on December 16, 2022, and December 19, 2022, respectively. Sheliga offered little additional factual testimony regarding these interactions. Sheliga testified that he was passed by a Windber Borough Police Department vehicle three times after his interaction with Corporal Miller on December 16, 2022. He also introduced video evidence of a police vehicle driving by him that day.

Moreover, Sheliga testified that he generally employs the same strategy while canvassing door to door in Windber Borough. Specifically, Sheliga testified that he introduces himself to the homeowner and explains that he is making the rounds talking about the Windber Borough Police Department and City Council. He then addresses what he perceives as the shortcomings of those Windber Borough instrumentalities.

Sheliga also testified that his interactions with Corporal Miller and Corporal Balderas have stopped him from engaging in door-to-door canvassing because he fears arrest.

On cross-examination, Sheliga admitted that no Windber Borough official has specifically told him that he will be arrested if he engages in political speech regarding the November 2023 election. Sheliga also acknowledged that there are pending state charges against him for disorderly conduct and harassment stemming from his door-to-door canvassing.

Finally, Sheliga testified that, when he was at Conjelko's on December 16, 2022, he gave a speech to those present that is similar to the one he usually gives while canvassing.

### 2. Testimony of Laurie Custer

Laurie Custer ("Ms. Custer") testified that she recalled observing Sheliga in Conjelko's on December 16, 2022. Ms. Custer recounted that Sheliga visited the store for roughly five minutes.

She testified that Sheliga loudly spoke to anyone who would listen during those five minutes, lamenting about City Council, Windber Borough, and asking where he could find members of the City Council.

Ms. Custer testified that after Sheliga left Conjelko's, he began loudly knocking on the doors of nearby homes. Ms. Custer stated that she called 911 because she was worried for Sheliga's safety and the safety of those around him since she found his speech and demeanor concerning.

On cross-examination, Ms. Custer clarified that nobody in Conjelko's asked Sheliga to leave on December 16, 2022.

### 3. Testimony of Corporal Miller

Corporal Miller testified that he was dispatched for a reported disturbance in Conjelko's on December 16, 2022. He confirmed that the woman he spoke to initially in the body-camera footage was Ms. Custer, who also called 911. Further, Corporal Miller testified that he never told Sheliga he would be charged with violating any Windber Borough ordinance, nor did he tell him he would be arrested if he engaged in door-to-door canvassing regarding the November 2023 election.

On cross-examination, when asked about whether he purposefully drove by Sheliga after their December 16, 2022, interaction, Corporal Miller testified that he regularly patrols that area. Corporal Miller disputed Sheliga's implication that he purposefully drove by Sheliga that day.

### 4. Testimony of Corporal Balderas

Corporal Balderas testified that he received a call indicating that Sheliga was causing a disturbance on December 19, 2022. He admitted that he told Sheliga on that day that he needed a

permit to go door to door but explained that he has since learned that he was mistaken. Corporal Balderas testified that he never told Sheliga he would be arrested if he engaged in political speech or canvassing regarding the November 2023 election.

On cross-examination, Corporal Balderas testified that there were multiple calls from citizens regarding Sheliga's door knocking on December 19, 2022. He clarified that those calls indicated Sheliga was disturbing the peace of Windber Borough citizens in their residences. Corporal Balderas also explained that Sheliga was not loudly screaming in the street when he first saw him on December 19, 2022, and that no one suggested that they asked Sheliga to leave their property and that he refused.

Corporal Balderas also testified that he learned from his Police Chief, Andrew Frear, that there was no requirement to obtain a permit before going door to door. When asked how he would handle a future encounter with someone going door to door, Corporal Balderas testified that he would not tell the individual they needed a permit.

### 5. Testimony of Chief Frear

Andrew Frear ("Chief Frear"), the Chief of Police in Windber Borough, testified that on December 20, 2022, he received a call at the police station regarding an individual at a person's residence who was being obnoxious and refused to leave after being told to do so. Chief Frear clarified that the call was from Dale Campbell ("Mr. Campbell"), and Sheliga was the individual who had knocked on his door. He testified that he charged Sheliga with disorderly conduct on December 20, 2022, and that Sheliga was subsequently charged with harassment at the preliminary hearing held in January 2023.

Moreover, Chief Frear testified that he is familiar with Windber Borough's ordinances, and the Borough does not have an ordinance, policy, or police department requirement that an individual must obtain a permit before going door to door. Indeed, he testified that the Borough did not possess a permit it could issue in such a scenario. Chief Frear also testified that he never told Sheliga he would be arrested for engaging in political speech or door-to-door canvassing regarding the November 2023 election.

On cross-examination, Chief Frear testified that Sheliga was not yelling or screaming when he first encountered him on December 20, 2022. Chief Frear further clarified that he had never spoken to Mr. Campbell before receiving his call on that day. Chief Frear also testified that if Sheliga were to again go door to door in Windber Borough, he would not attempt to make him obtain a permit to do so.

Additionally, Chief Frear testified that charges were filed against Sheliga in part because Sheliga's conduct has continued over a period of time.

### 6. Testimony of Dale Campbell

Mr. Campbell testified that on December 20, 2022, he heard a loud knock on his door. When he answered, he testified that Sheliga began speaking negatively about the Windber Borough Police Department. Mr. Campbell testified that he was also alarmed and concerned by Sheliga's demeanor.  Mr. Campbell further testified that he called the Windber Borough Police Department immediately after he observed Sheliga go from his house to his neighbor's house and knock on the door.

On cross-examination, Mr. Campbell clarified that he does not recall explicitly asking Sheliga to leave his residence on December 20, 2022. Instead, he testified that he effectively told

Sheliga that their conversation was over, but that he could not recall exactly what happened afterwards.

### 7.  Testimony of Ashley Greathouse

Finally, Ashley Greathouse ("Ms. Greathouse") testified that Sheliga appeared at her residence on December 16 and 19, 2022. Relative to Sheliga's stops at her residence, Ms. Greathouse testified that the doorbell video recordings played by defense counsel showing Sheliga repeatedly ringing the doorbell and standing in front of the home were taken from her doorbell and her neighbor's.[4] She further testified that her young daughter once answered the door, saw Sheliga, and became frightened. Ms. Greathouse stated that she had spoken to Corporal Miller about Sheliga repeatedly coming to her door.

On cross-examination, Ms. Greathouse testified that she does not have a "no soliciting" or "no trespassing" sign on her property. She also testified that after Sheliga was arrested, she was contacted by the Windber Borough Police Department to provide the doorbell footage of Sheliga.

Moreover, Ms. Greathouse did not refute Sheliga's assertion that he rang her doorbell on December 16 and 19, 2022. Although Ms. Greathouse initially testified that she never spoke to Sheliga, Sheliga pointed to her testimony at his state preliminary hearing that she once opened the door briefly for him, at which time Sheliga began discussing the Windber Borough Police Department arresting him. Ms. Greathouse did not deny that this brief encounter occurred.

### IV.  Procedural History

---

[4] Ms. Greathouse testified that because she lives in a duplex, her neighbor's door is in close proximity to hers.

On June 23, 2023, Sheliga, proceeding *pro se*, filed a Complaint against Brian Miller, Daniel Schrader, and Windber Borough ("Defendants") in the United States District Court for the Western District of Pennsylvania. (ECF No. 1). In his Complaint, Sheliga broadly asserts violations of his First Amendment rights under 42 U.S.C. § 1983. (*Id.*).

On September 1, 2023, Defendants moved to dismiss Sheliga's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 10). Sheliga opposed that motion, and both parties filed briefs in support or opposition. (ECF Nos. 11–13).

On October 19, 2023—before the Court addressed Defendants' pending Motion to Dismiss—Sheliga filed his Motion for a Temporary Restraining Order and Preliminary Injunction. (ECF No. 15). Sheliga also submitted a brief and several exhibits in support of his motion to the Court. (ECF Nos. 16, 17).

On October 20, 2023, United States Magistrate Judge Keith A. Pesto ("Judge Pesto") was added to Sheliga's case. Judge Pesto held a status conference regarding Sheliga's pending motion for a temporary restraining order and preliminary injunction on October 23, 2023. (ECF No. 19). Following that status conference, Judge Pesto scheduled a preliminary injunction hearing to be held on October 27, 2023. (*Id.*).

On October 25, 2023, Defendants filed their "Brief Opposing Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction[.]" (ECF No. 24). Defendants also attached an exhibit in support of their motion. (ECF No. 24-2).

However, because not all parties consented to Judge Pesto's jurisdiction within the requisite timeframe, the preliminary injunction hearing was cancelled. (ECF No. 22). On October

25, 2023, this Court entered an Order scheduling a preliminary injunction hearing on Sheliga's motion for October 27, 2023. (ECF No. 23).

Accordingly, the Court held a hearing on October 27, 2023, at 10:00 a.m. in Courtroom A in Johnstown, Pennsylvania. (ECF No. 28). Sheliga, proceeding pro se, appeared at the hearing. Defendants' attorney, Alexander Brown, appeared at the hearing. Defendant Corporal Miller appeared and testified at the hearing.

At the conclusion of the hearing, the Court took the matter under advisement and granted the parties permission to submit additional argument in writing by 5:00 p.m. on October 30, 2023. Sheliga filed his "Final Arguments Supporting Plaintiff['']s Motion for a Temporary Restraining Order[.]" (ECF No. 26). Sheliga also filed two supplements regarding his submission of exhibits to the Court. (ECF Nos. 27, 29).[5] Defendants submitted no additional argument by the Court-imposed deadline.

## V.    Legal Standard

As previously explained, Sheliga moves for both a temporary restraining order and a preliminary injunction against Corporal Miller and Windber Borough. (ECF No. 15-1 at 1). "A temporary restraining order differs from a preliminary injunction in that, under certain circumstances, a temporary restraining order may be issued without notice to the adverse party or its attorney." *Carbello v. Beard*, No. 06-336, 2008 WL 597722, at *5 (E.D. Pa. Mar. 3, 2008) (citing FED. R. CIV. P. 65(b)). In this case, however, because of the hearing held by the Court, both parties

---

[5] In Sheliga's October 30, 2023, filing, he expresses his concern that he was unable to submit his exhibits to the Clerk's Office before the Court-imposed deadline of 5:00 p.m. that day. (ECF No. 26 at 3–4). The Court notes that because it is sympathetic to the logistical challenges Sheliga points to, Sheliga's request for a formal extension of that deadline is unnecessary. Sheliga noted that he shipped his exhibits to the Court as quickly as he could, and the Court confirms that it received the digital copies of those exhibits on October 31, 2023, before it issued this opinion. (*See* ECF No. 30).

have had a full opportunity to brief the issues and present oral argument. Accordingly, the Court treats Sheliga's motion as one for a preliminary injunction. *See* Fed. R. Civ. P. 56(a).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). A preliminary injunction is appropriate only "upon a clear showing that the [movant] is entitled to such relief." *Id.* at 22 (citation omitted). In determining whether a party is entitled to a preliminary injunction, courts consider four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed without the preliminary injunction; (3) whether the balance of equities favors granting a preliminary injunction, including any harm to the nonmoving party; and (4) whether granting the preliminary injunction will be in the public interest. *Id.* at 20; *Columbia Gas Transmission, LLC v. Temporary Easements for Abandonment of a Nat. Gas Pipeline Across Somerset & Fayette Cntys., Pa.*, No. 3:16-cv-268, 2017 WL 1284943, at *3 (W.D. Pa. Apr. 5, 2017) (Gibson, J.).

## VI. Discussion

### A. The Hearing Testimony Refuted Sheliga's Argument that Windber Borough Has an Ordinance Requiring Prior Permission to Engage in Political Canvassing

Sheliga's first argument in support of his motion for a preliminary injunction is that Windber Borough has enacted an ordinance requiring individuals to obtain a permit before engaging in door-to-door political canvassing. (ECF No. 15-1 at 5). Sheliga points to his interaction with Corporal Balderas outlined above, in which Corporal Balderas stated that Sheliga needed to obtain a permit before going door to door. (*Id.*). Sheliga contends that the Supreme Court's

decision in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), makes it clear that such an ordinance is unconstitutional. (*Id.*).

At the outset, the Court notes that Sheliga's general assertion that *Watchtower* would render unconstitutional an ordinance requiring him (and others) to obtain a permit in order to engage in door-to-door political canvassing is likely correct.[6] *See Watchtower*, 536 U.S. at 165–66 (explaining that such an ordinance is "offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so"). Moreover, the Court recognizes that the statements Corporal Balderas made to Sheliga on December 19, 2022, would suggest that Windber Borough has such an ordinance in place. However, the testimony provided at the preliminary injunction hearing makes clear that Windber Borough has not enacted any ordinance requiring individuals to obtain a permit before canvassing door to door.

At the preliminary injunction hearing, Corporal Balderas testified that he was mistaken when he told Sheliga he was required to obtain a permit before going door to door. He explained that at the time he interacted with Sheliga on December 19, 2022, he was under the impression that such a permit was required, but that he has since learned that this is incorrect. Chief Frear also testified that he was familiar with Windber Borough's ordinances, and that there was no

---

[6] That conclusion, of course, would necessarily depend on the text of the hypothetical ordinance.

ordinance requiring a permit for door-to-door canvassing. Indeed, Chief Frear indicated that the Borough had no permit to issue in such a scenario.

Based on this testimony, Sheliga indicated in his October 30, 2023, filing that he "feels it [is] more likely than not that agents of Windber Borough, [and] Corporal Balderas . . . were simply wrong when they informed Plaintiff of a Borough ordinance requiring a permit to engage in door to door canvassing." (ECF No. 26 at 1). Accordingly, Sheliga states that "he cannot, at this time, advocate for a TRO (or PI) for this matter." (*Id.*).

Thus, in light of the testimony at the preliminary injunction hearing and Sheliga's indication that he no longer wishes to pursue a preliminary injunction based on Windber Borough's alleged ordinance, the Court denies as moot Sheliga's request for equitable relief on that ground.

Accordingly, the Court now turns its attention to Sheliga's assertion that because Officer Miller "threatened to arrest [him] for door to door canvassing[,]" he is "suffering irreparable harm and his constitutional rights are being violated." (ECF No. 25 at 1).

**B. Sheliga Has Failed to Show a Likelihood of Substantial and Immediate Irreparable Harm**

As explained above, courts consider four factors when analyzing whether a party is entitled to a preliminary injunction. But courts consider the latter two factors only if the movant "meet[s] the threshold for the first two most critical factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible . . .) and that it is more

likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (citations omitted).

To prove irreparable harm, the movant must show that its injury is "immediate," *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987), and not merely "speculative," *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000). In other words, "establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI*, 809 F.2d at 226 (quoting *Continental Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). As the Supreme Court has explained, "[t]he equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 448, 502 (1974)).

Sheliga's motion for a preliminary injunction is premised on his allegation that "Defendant Windber Borough and Defendant Miller's actions involve the loss of [F]irst [A]mendment freedoms[,]" which Sheliga argues "constitutes irreparable injury[.]" (ECF No. 15-1 at 9). The Court finds two cases in which the Supreme Court reversed a lower court's grant of equitable relief particularly instructive in addressing Sheliga's arguments.

In *L.A. v. Lyons*, the respondent—Adolph Lyons ("Lyons")—filed a complaint alleging he was illegally placed in a chokehold by a City of Los Angeles Police Officer, despite the fact that he offered no resistance or threat. *Lyons*, 461 U.S. at 97. Lyons later applied for a preliminary injunction, seeking to enjoin the City of Los Angeles Police Department from using such chokeholds under circumstances which do not threaten death or serious bodily injury. *Id.* at 99–

100. The district court entered a preliminary injunction to that effect, and the Court of Appeals affirmed that decision. *Id.* But the Supreme Court reversed. *Id.* at 100.

The Supreme Court concluded "that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id.* at 105. In reaching that conclusion, the Court explained:

> That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Id.* at 105. The Court went on to note that "Lyons' claim that he was illegally strangled remains to be litigated in his suit for damages[.]" *Id.* at 109. Thus, because "there was no finding that Lyons faced a real and immediate threat of again being illegally choked[,]" *id.* at 110, the Court held that "[t]he speculative nature of Lyon's claim of future injury requires a finding that this prerequisite of equitable relief[—a likelihood of substantial and immediate irreparable injury—]has not been fulfilled." *Id.* at 111.

The Supreme Court faced a similar scenario in *O'Shea v. Littleton*, 414 U.S. 488 (1974), in which the individual respondents alleged that a county magistrate and judge had embarked on a continuing, intentional practice of racially discriminatory bond setting, sentencing, and assessing of jury fees. *O'Shea*, 414 U.S. at 491–92. The respondents argued that there was no adequate remedy at law and requested that the practices be enjoined by the District Court. *Id.* at 492. Although the District Court dismissed the case for lack of jurisdiction to issue the injunctive relief respondents sought, the Court of Appeals ruled that the District

Court should proceed to fashion appropriate injunctive relief to prevent petitioners from depriving others of their constitutional rights in the course of carrying out their judicial duties in the future. *Id.* at 492–93.

The Supreme Court granted certiorari and reversed the judgment of the Court of Appeals. *Id.* at 493. The Court began by explaining that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96. The Court further recognized that while "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," the attempt to anticipate under what circumstances the respondents would be made to appear before the petitioners in the future "takes us into the area of speculation and conjecture." *Id.* at 496–97. Accordingly, the Court held that "[c]onsidering the availability of other avenues of relief open to respondents for the serious conduct they assert, and the abrasive and unmanageable intercession which the injunctive relief they seek would represent . . . the Court of Appeals erred in deciding that the District Court should entertain respondents' claim." *Id.* at 504.

In light of *Lyons* and *O'Shea*, the Court finds that Sheliga has failed to meet his burden of showing a likelihood of substantial and immediate irreparable injury at the hands of Corporal Miller or Windber Borough.[7] Sheliga asserts that Corporal Miller's statements to him

---

[7] The Court notes that this conclusion applies with equal weight to any argument that Sheliga's "past exposure to illegal conduct" carried with it "continuing, present adverse effects." *O'Shea*, 414 U.S. at 496. Although Sheliga argues that Corporal Miller and Windber Borough's conduct has chilled his First Amendment expression by making him fearful of arrest, any "continuing, present adverse effects" in this context would necessarily present themselves as an ongoing likelihood of irreparable harm. As the Court will explain in the text above, Sheliga has failed to show that he is at risk of suffering irreparable harm. Accordingly, in the absence of a showing of irreparable harm, Sheliga also fails to produce evidence of any

"amount to a blanket ban on any door to door canvassing" in violation of his First Amendment rights. (ECF No. 15-1 at 8–9). Similar to *Lyons*, Sheliga submits that his interaction with Corporal Miller on December 16, 2022, supports his request for injunctive relief.

However, just as there "was no finding that Lyons faced a real and immediate threat of again being illegally choked[,] *Lyons*, 461 U.S. at 110, here, the Court cannot find that Sheliga faces a real and immediate threat of being arrested solely for engaging in door-to-door political canvassing. The preliminary injunction hearing made clear that what Sheliga contends was "political canvassing" led Ms. Custer to call 911 out of alarm and concern, which prompted the dispatch call to Corporal Miller that led to the December 16, 2022, interaction Sheliga principally relies upon in seeking his preliminary injunction.

Indeed, Corporal Miller told Sheliga that he was responding to calls from residents indicating that Sheliga was "scaring the neighborhood" and was being "disorderly inside [a] place of business, hindering their business." (ECF No. 11-2). Corporal Miller asked Sheliga about his conduct at Conjelko's as well as his knocking on doors. (*Id.*). He further explained that the callers stated Sheliga was asking patrons where he could find members of the City Council. (*Id.*). And Corporal Miller was clear that he was not arresting or citing Sheliga, but that he would do so if Sheliga engaged in disorderly conduct. (*Id.*).

Therefore, based on the body-camera footage, the Court finds that Corporal Miller's statements to Sheliga on December 16, 2022, were not solely premised on Sheliga engaging in political speech with potential voters. Instead, it was based on complaints Windber Borough

---

"continuing, present adverse effects" stemming from Corporal Miller or Windber Borough's conduct that weighs in favoring of granting the injunctive relief he seeks.

received from citizens, including Ms. Custer, concerned with Sheliga's conduct in Conjelko's and afterwards. The Court therefore disagrees with Sheliga's assertion that "[a]ny average citizen would understand" Corporal Miller's statements "to mean that" there is a "blanket ban on any door to door canvassing." (ECF No. 15-1 at 9).

With that factual finding in place, because the irreparable harm Sheliga alleges he is suffering from is the threat of arrest *solely* for canvassing door-to-door, the Court harbors great doubt that Sheliga's interaction with Corporal Miller constitutes a "past wrong" that could bear on "whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496–97. This conclusion is bolstered by the fact that Sheliga admitted, on cross-examination, that no Windber Borough official has told him he will be arrested strictly for engaging in speech regarding the November 2023 election. Moreover, Corporal Miller, Corporal Balderas, and Chief Frear all testified that they never told Sheliga he would be arrested solely for door-to-door canvassing regarding the November election.

Therefore, just as granting the injunctive relief in *O'Shea* improperly required the Court to anticipate under what circumstances the petitioners would be called before the magistrate judge in the future, crafting the injunctive relief Sheliga seeks—directing Officer Miller and Windber Borough not to arrest Sheliga solely for political canvassing—would require the Court to anticipate under what circumstances Windber Police may encounter Sheliga in the future. *Id.*

Put differently, issuing a preliminary injunction on these facts would take the Court—having no proof that any Windber Borough official has threatened to arrest Sheliga solely for political canvassing—squarely "into the area of speculation and conjecture." *Id.* at 497. Issuing

such an injunction would necessarily require the Court to assume that Windber Borough or Corporal Miller will attempt to arrest or dissuade Sheliga from political canvassing in the future simply because he is doing so, and not because the Borough received complaints regarding Sheliga's conduct. Nothing before the Court supports that assumption.

The Court stresses, as the Supreme Court did in *O'Shea*, that withholding injunctive relief in this instance does not mean that the "federal law will exercise no deterrent effect in these circumstances." *Id.* at 503. Indeed, Sheliga's claim that Officer Miller interfered with his First Amendment rights on December 16, 2022, remains to be litigated in his underlying § 1983 suit for damages.[8] *See Lyons*, 461 U.S. at 109. "The speculative nature of [Sheliga's] claim of future injury," therefore, "requires a finding that" Sheliga has "not [] fulfilled" his obligation of showing a "likelihood of substantial and immediate irreparable injury." *Id.* at 111 (citing *O'Shea*, 414 U.S. at 502).[9] Because the Court finds that Sheliga will not suffer an

---

[8] The Court notes that Sheliga's Complaint seeks both injunctive relief and nominal damages against Defendants. (ECF No. 1 at 4). The Court stresses that the conclusions contained in this opinion only go towards Sheliga's request for a preliminary injunction based on Officer Miller's conduct.

[9] The Court notes that the Supreme Court has also held, when faced with a request for a preliminary injunction, "that plaintiff's showing at trial of relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief." *Lyons*, 461 U.S. at 104 (citing *Rizzo v. Goode*, 423 U.S. 362 (1976)). Here, Sheliga has likewise failed to show a deliberate policy on behalf of Corporal Miller or Windber Borough regarding the alleged suppression of his First Amendment rights. Indeed, as previously explained, the hearing testimony showed Windber Borough had no ordinance requiring prior permission to engage in political canvassing. And Chief Frear testified that the Borough harbors no similar policy or custom. Accordingly, this fact also supports the Court's conclusion that Sheliga has failed to provide a proper basis for equitable relief.

irreparable harm in the absence of injunctive relief, the Court need not address the additional factors required for a preliminary injunction.

### C. Sheliga's Requested Relief Is Barred by the Abstention Doctrine of *Younger v. Harris*

Assuming, *arguendo*, that Sheliga has shown that he will suffer irreparable harm without a preliminary injunction, the Court also concludes that the principles of comity counsel in favor of denying Sheliga's motion under *Younger v. Harris*, 401 U.S. 37 (1971). *See, e.g., Dovin v. Chester Cnty. Dep't of Aging Servs.*, No. 23-3175, 2023 WL 5651983, at *7–12 (E.D. Pa. Aug. 31, 2023) (finding first that the plaintiff failed to show that he would suffer an irreparable harm, and then alternatively holding that abstention is warranted under *Younger*).

As previously noted, Sheliga was arrested while canvassing door-to-door in Windber Borough on December 20, 2022—just days after his interactions with Corporal Miller and Corporal Balderas. Sheliga played a brief video of that arrest at the hearing, which indicated Chief Frear arrested him based on a complaint he received that Sheliga was pounding on doors. Chief Frear and Mr. Campbell's testimony confirms that Chief Frear received a call from Mr. Campbell regarding Sheliga knocking on his door and, when he arrived, he arrested Sheliga and charged him with disorderly conduct under Pennsylvania law. Both Sheliga and Chief Frear testified that Sheliga was subsequently charged with harassment at a preliminary hearing in state court. And both parties recognize that those state charges are currently pending against Sheliga.

Defendants argue that because "[a]n underlying criminal prosecution against Sheliga for harassment and disorderly conduct is pending in the Court of Common Pleas of Somerset

County[,]" the relief Sheliga seeks "is barred by the abstention doctrine of *Younger v. Harris.*"
(ECF No. 24 at 9–10).

"*Younger* abstention presents one of the limited exceptions to a federal court's 'virtually
unflagging obligation' to hear and decide cases within the scope of its jurisdiction." *Greco v. Bruck*,
No. 21-1035, 2022 WL 1515375, at *6 (3d Cir. May 13, 2022) (quoting *Colo. River Water Conservation
Dist. v. United States*, 424 U.S. 800, 817 (1976)). The doctrine prohibits federal courts from hearing
cases related to certain ongoing state-court proceedings. *Id.* (citing *Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69, 72 (2013)). In this way, *Younger* abstention serves a dual purpose: (1) it promotes
comity by restricting federal court interference with ongoing state judicial proceedings, and (2) it
restrains equity jurisdiction "when state courts provide adequate legal remedies for
constitutional claims and there is no risk of irreparable harm." *PDX North, Inc. v. Comm'r N.J.
DOL & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020).

The Third Circuit has framed a test to determine when *Younger* abstention is appropriate.
In order for a federal court to abstain under the *Younger* doctrine:

> (1) there [must be] ongoing state proceedings that are judicial in nature; (2) the state
> proceedings [must] implicate important state interests; and (3) the state proceedings
> [must] afford an adequate opportunity to raise federal claims. Even if the necessary three
> predicates exist, however, *Younger* abstention is not appropriate if the federal plaintiff can
> establish that (1) the state proceedings are being undertaken in bad faith or for purposes
> of harassment or (2) some other extraordinary circumstances exist . . . such that deference
> to the state proceeding will present a significant and immediate potential for irreparable
> harm to the federal interests asserted.

*Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989) (citing *Middlesex Cnty. Ethics Comm. v. Garden
State Bar Ass'n*, 457 U.S. 423, 432, 435 (1982)). And, as relevant to Sheliga's request for relief,
"[f]ederal courts have used the *Younger* doctrine to abstain from granting requests for

preliminary injunctions where a pending state action relates to important state interests and the proceeding affords the movant adequate relief." *Mader v. Union Twp.*, 2:20-CV-01138, 2021 WL 1259312, at *25–26 (W.D. Pa. Apr. 6, 2021) (citing *Rose v. York Cnty.*, 1:13-cv-2056, 2013 WL 4458973 (M.D. Pa. Aug. 6, 2013)); *see also Gwynedd Properties, Inc. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1200 (3d Cir. 1992).

*Younger* abstention "is only appropriate in three types of underlying state cases: (1) criminal prosecutions, (2) civil enforcement proceedings, and (3) 'civil proceedings involving orders in furtherance of the state courts' judicial function.'" *PDX*, 978 F.3d at 882 (quoting *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014)). Here, neither party disputes that there is an ongoing criminal prosecution of Sheliga in state court.[10] The only relevant inquiries are therefore (1) whether those state proceedings implicate an important state interest and (2) whether they afford Sheliga an adequate opportunity to raise his federal claims. *Schall*, 885 F.2d at 106.

On these points, Sheliga argues that *Younger* abstention is inapplicable to his case. By his telling, "Chief Frear's decision to arrest [him], and the resulting criminal case[,] is not relevant to [his] [F]irst Amendment rights threatened by Corporal Balderas or Defendant Miller." (ECF No.

---

[10] The Court also notes that "state proceedings are 'ongoing' for *Younger* abstention purposes" if the state proceeding "was pending at the time [the plaintiff] filed its initial complaint in federal court." *PDX*, 978 F.3d at 885 (quoting *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408–09 (3d Cir. 2005)). Here, because Sheliga filed his Complaint on June 23, 2023, (ECF No. 1), and Sheliga was charged in state court in December 2022 and January 2023, the state proceedings are "ongoing" for *Younger* abstention purposes.

25 at 3). For the following reasons, the Court finds Sheliga's arguments unpersuasive and concludes that *Younger* precludes the Court from issuing the injunctive relief Sheliga seeks.

As an initial matter, the Court finds little merit to Sheliga's argument that the "risk of irreparable harm" with which he is faced renders *Younger* abstention inappropriate. (*See* ECF No. 25 at 10). The Court has already explained why Sheliga has failed to show the requisite likelihood of substantial and immediate irreparable harm. Therefore, Sheliga cannot use that allegedly impending irreparable harm as a shield against *Younger*'s abstention doctrine.

Regarding *Younger* abstention's second requirement, Sheliga "questions if [] disorderly conduct-harassment charge[s] are 'important state interests'" under *Younger*. (ECF No. 25 at 10). Courts do not consider the merits when "inquir[ing] into the substantiality of the State's interest in its proceedings." *O'Neill v. City of Philadelphia*, 32 F.3d 785, 791–92 (3d Cir. 1994). "Rather, what [courts] look to is the importance of the generic proceedings to the State." *Id.*

As Justice Stewart explained in *Younger*, "[a] State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law." *Younger v. Harris*, 401 U.S. 37, 55 n.2 (1971) (Stewart, J., concurring). That is why "[c]ourts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases." *Id.*

Here, Windber Borough's enforcement of the Commonwealth's disorderly conduct and harassment statutes against Sheliga implicates the Borough's strong interest in vindicating "the broader 'right [of its citizens] to be let alone'"—a right the Supreme Court has characterized as "the most comprehensive of rights and the right most valued by civilized men." *Hill v. Colorado*, 530 U.S. 703, 716 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928)). Indeed, "[t]he

right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings[.]" *Id.* (citing *Rowan v. Post Office Dept.*, 397 U.S. 728, 738 (1970); *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)) (citations omitted). Sheliga's state prosecution, which stems from complaints Windber Borough received from its citizens regarding Sheliga's allegedly disruptive and alarming conduct while going door to door, therefore necessarily implicates an important state interest. Accordingly, *Younger* abstention's second requirement is satisfied.

The third and final requirement for *Younger's* abstention doctrine to apply is that Sheliga's pending state proceedings afford him an adequate opportunity to raise his federal claims. *Schall*, 885 F.2d at 106. Sheliga first argues that his state proceedings "do not afford an adequate opportunity to raise federal claims related to door to door canvassing without a permit." (ECF No. 25 at 10). However, because Sheliga has indicated he is no longer advancing his ordinance/permit-based arguments, this contention is immaterial.

Sheliga's general assertion on this point is that his conduct at issue in the pending state-court matter is separate from the conduct at issue during his interaction with Corporal Miller on December 16, 2022. (ECF No. 26 at 12). He states that because he was charged in state court based on his interactions with Mr. Cunningham and Ms. Greyhouse, Corporal Miller "could not have even known about these incidents when he threatened to arrest [him] for door to door canvassing, because they had not yet occurred." (*Id.*). Sheliga argues that he cannot adequately raise the First Amendment arguments he posits in his motion for a preliminary injunction because "[t]he Commonwealth is not asserting at this time, that as part of the criminal trial, [] the act of going door to door to engage in political speech is in and of itself criminal. Rather[,] they are asserting

that [Sheliga's] body language constitutes disorderly conduct, and that re-canvassing constitutes harassment." (ECF No. 26 at 7).

However, the Court is unpersuaded by Sheliga's argument that the conduct at issue in his pending state-court proceedings is sufficiently distinct from the conduct at issue in his motion for a preliminary injunction such that he is unable to adequately raise his federal claims in state court. Sheliga testified at the preliminary injunction hearing that his actions while engaging in door-to-door canvassing in Windber Borough were consistent throughout December 2022. At each door, Sheliga explained, he gave the same speech regarding the issues he perceived with the Windber Borough Police Department and City Council.

Indeed, Mr. Campbell—whose complaint spurred the pending state charges against Sheliga—testified that when he answered the door on December 20, 2022, Sheliga began to give that same speech. Sheliga also elicited testimony from Ms. Cunningham on cross-examination that indicates Sheliga attempted to make a similar speech to her on either December 16 or 19, 2022. Ms. Custer testified that Sheliga was knocking on doors in a similar fashion when she called 911 on December 16, 2022. And Sheliga himself testified that he gave the same speech he gives everyone else at Conjelko's on December 16, 2022, before proceeding to knock on doors.

Moreover, other testimony offered at the preliminary injunction hearing suggests that Sheliga's December 16, 2022, conduct may be at issue in the pending state-court proceeding. For example, Chief Frear testified that he filed charges against Sheliga because his conduct has continued over a period of time. Sheliga also testified that he went to Ms. Greathouse's door on December 16 and 19, 2022. And Ms. Greathouse testified that after Sheliga was arrested, she was

contacted by the Windber Borough Police Department to provide the videos her doorbell camera captured of Sheliga on those dates as evidence to support the state charges against him.

Based on these findings of fact, the Court concludes that Sheliga is capable of presenting his First Amendment argument that his door-to-door canvassing is constitutionally protected while attempting to refute the charges currently pending against him in state court. Simply put, the Court cannot square Sheliga's testimony that he consistently engaged in the same conduct while canvassing door to door in Windber Borough with his argument that his federal claims regarding his December 16, 2022, canvassing cannot be adequately addressed in the ongoing state proceedings regarding his December 19 and 20, 2022, canvassing.

Still, Sheliga argues that "the allegation [Corporal] Miller made about [him] and Conjelko[']s is not mentioned in the Affidiavit of Probable Cause[,]" (ECF No. 26 at 10), to support his contention that his ongoing state criminal proceeding bears no relevance to his request for a preliminary injunction. But Sheliga's requested relief would not address his conduct at Conjelko's. Instead, it would only address Sheliga's ability to go door to door and engage in political speech—conduct Sheliga himself admits was relatively uniform through December 2022 and consisted of him explaining his perceived shortcomings of Windber Borough. That is precisely what Sheliga was doing when he was arrested on December 20, 2022. And that is therefore the conduct at issue in Sheliga's ongoing state criminal proceedings. Again, Sheliga is free to argue that the First Amendment protects that conduct in state court.

While the Court is confident that Sheliga can adequately raise his federal claims in state court, the Court rests its ultimate conclusion that *Younger* abstention is appropriate in this case on its determination that it cannot issue the preliminary injunction Sheliga seeks without

substantially "interfere[ing] with" the "ongoing state criminal proceeding" against him. *Younger*, 401 U.S. at 91.

Sheliga essentially seeks a preliminary injunction stating that Corporal Miller and Windber Borough cannot arrest him solely for engaging in political speech. (ECF No. 15 at 2). As the Supreme Court has held, "recognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate." *Lyons*, 461 U.S. at 112 (citing *O'Shea*, 414 U.S. at 499). Because the Court has already found that Sheliga has failed to show a sufficient risk of irreparable injury, this instruction weighs strongly against issuing an injunction against Corporal Miller and Windber Borough, who are clearly engaged in the administration of the Commonwealth's criminal laws against Sheliga.

Moreover, issuing an injunction mandating that Corporal Miller cannot arrest Sheliga solely for engaging in political speech on the facts presented would require the Court to implicitly find that Sheliga's December 16, 2022, conduct could not constitute disorderly conduct or harassment, such that Corporal Miller's threat to arrest Sheliga on that day was unfounded. As previously explained, Sheliga must show that he is likely to suffer irreparable harm absent a preliminary injunction. Because Sheliga relies exclusively on his December 16, 2022, interaction with Corporal Miller to support his contention that he faces irreparable harm, a finding that Sheliga has satisfied his burden on this point would require the Court to effectively conclude that the conduct for which Corporal Miller threatened to arrest Sheliga was constitutionally protected.

Otherwise, Sheliga's interaction with Corporal Miller could not constitute a past harm supporting Sheliga's claim of irreparable injury.

Because such a finding would necessarily implicate the constitutionality and propriety of Sheliga's door-to-door canvassing—which is the conduct at issue in his state-court proceeding— reaching that conclusion would interfere with Corporal Miller and Windber Borough's "administration of the States' criminal laws" against Sheliga. And granting the injunctive relief Sheliga seeks would necessarily interfere with the state court's eventual determination as to whether Sheliga's door-to-door canvassing constituted disorderly conduct and harassment. *See Gwynedd Properties, Inc. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1204 (3d Cir. 1992) (explaining that *Younger* "abstention is appropriate to the extent an injunction . . . would result in a *de facto* review" of the issues "currently under review in the state courts").

This conclusion is bolstered by the fact that the state magistrate judge overseeing Sheliga's state prosecution placed a condition upon Sheliga's bond that he cannot engage in the type of behavior for which he was arrested.[11] Windber Borough police officers, including Corporal Miller, are tasked with ensuring that Sheliga complies with this bond condition. A preliminary injunction stating that Corporal Miller and Windber Borough cannot arrest Sheliga for engaging in political speech would frustrate any attempt by the Borough to ensure Sheliga's compliance with that bond condition. The Court can readily imagine a scenario in which a Borough official would be hesitant to enforce the state court's bond condition in light of a preliminary injunction preventing Sheliga's arrest for engaging in political speech.

---

[11] Sheliga did not contest that the magistrate judge placed that condition on his bond at the preliminary hearing.

Because it is this sort of federal intervention in pending state-court proceedings that *Younger* abstention serves to prevent, the Court concludes that it is in the interest of comity to exercise its discretion to abstain under *Younger* in deference to the ongoing state proceedings regarding the legality of Sheliga's door-to-door canvassing.[12]

**VII.    Conclusion**

Based on the forgoing reasons, Sheliga's "Motion for a Temporary Restraining Order and Preliminary Injunction[,]" (ECF No. 15), is **DENIED.** An appropriate order follows.

---

[12] Finally, the Court notes that Sheliga has failed to show that any exception to *Younger* abstention applies in his case. The Court has already addressed Sheliga's argument that the allegedly irreparable harm he faces precludes *Younger*'s application. *Younger* abstention is also inappropriate where "the federal plaintiff can establish that (1) the state proceedings are being undertaken in bad faith or for purposes of harassment[.]" *Schall*, 885 F.2d at 106 (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 435 (1982)). Here, Sheliga has presented no evidence that goes towards establishing that the state charges against him were initiated in bad faith or for the purposes of harassment. Accordingly, the Court concludes that no exception to *Younger* abstention applies.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL JOHN SHELIGA,              )          Case No. 3:23-cv-00139
                                   )
                                   )
            Plaintiff,             )          JUDGE KIM R. GIBSON
                                   )
      v.                           )
                                   )
WINDBER BOROUGH, BRIAN MILLER,     )
*Windber Borough Police Officer*, and  )
DANIEL SCHRADER, *Former Windber*  )
*Borough Police Officer*,          )
                                   )
                                   )
            Defendants.            )

<u>ORDER</u>

AND NOW, this 1st day of November, 2023, for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that Plaintiff Michael Sheliga's "Motion for a Temporary Restraining Order and Preliminary Injunction[,]" (ECF No. 15), is **DENIED WITHOUT PREJUDICE.**

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE